**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| : | |
| : | |
| : | |
| : | **OPINION** |
| In re: BULK [EXTRUDED] GRAPHITE : | |
| PRODUCTS ANTITRUST LITIGATION : | Civ. No. 02-6030 (WHW) |
| : | |
| : | |
| : | |
| : | |
| : | |

**Walls, District Judge**

　　This matter is before the Court on the plaintiffs' motion for certification of a nationwide

plaintiff class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The proposed

plaintiff class representatives are: Industrial Graphite Products, Inc., Graphite Machining, Inc.,

Midwest Graphite Co., and Semco Carbon.  The parties appeared before this Court for oral

argument on January 24, 2006.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

　　This case involves a proposed class action under antitrust law for claims of horizontal

price-fixing.[1]  Defendants are alleged to have engaged in a world-wide conspiracy to fix, raise,

stabilize and maintain at artificially high levels the prices charged for bulk extruded graphite

products ("bulk extruded graphite") in the United States and elsewhere.  The proposed plaintiff

class representatives are Industrial Graphite, Inc., Graphite Machining, Inc., Midwest Graphite

---

[1]Additional facts are set forth in this Court's Opinion of October 28, 2004, denying
defendants' motions to dismiss.  In re: Bulk [Extruded] Graphite Products Antitrust Litigation,
No. 02-6030, slip op. at 1 (D.N.J. October 28, 2004).

NOT FOR PUBLICATION

Co., and Semco Carbon (collectively, "Plaintiffs"), various purchasers of bulk extruded graphite.

Defendants are SGL Carbon, LLC ("SGL US"), SGL Carbon AG ("SGL AG"), and SGL Carbon

GmbH ("SGL GmbH"), and Robert J. Koehler ("Koehler") (collectively, "Defendants").  SGL

US, SGL AG, and SGL GmbH are various sellers of bulk extruded graphite, and Koehler is

Chairman of the Board of Management of SGL AG.  An additional company, UCAR Carbon

Company ("UCAR"), which is now known as GrafTech, was also named as a defendant in the

Consolidated Amended Class Action Complaint ("Amended Complaint").  On March 8, 2004,

this Court approved the class settlement with UCAR.

Graphite is a good conductor for electricity and is extremely resistant to temperature

shock.  The strength increases at higher temperatures with minimal thermal expansion. Both

isostatic and extruded graphite are known in the industry as specialty graphite products.  Isostatic

products are formed from pressure on the ingredients pressed in all directions.  Extruded

products, on the other hand, are formed when the mixture of ingredients are poured into a mold

and pushed out through a dye, similar to squeezing toothpaste out of a tube.  Because of its

ability to withstand extreme temperatures, extruded products are used in many industries and

applications, such as in furnaces, foundries and in other manufacturing processes that require

resistance to high temperatures.  Customers who purchase bulk extruded graphite come from a

variety of industries, including chemicals, glass, aerospace, metallurgy, and medical products.

Customers fall into one of three discrete categories: (i) "end users"; (ii) original

equipment manufacturers ("OEMs"); and (iii) "machine shops."  End users employ extruded

graphite in their own production processes. For example, a chemical manufacturer might use a

**NOT FOR PUBLICATION**

graphite crucible to make chemicals.  OEMs, by contrast, use extruded graphite as components in

the products (e.g., machines) that they manufacture and sell to others.  End users and OEMs may

use extruded graphite in its bulk form or they may have it machined, either with their own

facilities or by an independent machine shop.  Machine shops purchase bulk extruded graphite,

machine it, and sell it to end users and OEMs.  Machine shops may in some instances purchase

bulk extruded graphite from other machine ships or even directly from OEMs which have their

own extruded graphite production facilities.  Most manufacturers, including SGL US and UCAR,

also have in-house machine shops and retain the capability to sell machined extruded graphite.

All three categories of customers primarily purchase bulk extruded graphite directly from

manufacturers (either U.S. or foreign), such as the defendants.  The four proposed class

representatives in this case are all machine shops.

Plaintiffs allege that as early as January 1993, defendants and their co-conspirators

entered into and participated in a conspiracy to suppress and eliminate competition by fixing the

prices of, and allocating markets for, bulk extruded graphite sold in the United States and

elsewhere.  They claim that this activity was an unreasonable restraint of trade and commerce. In

furtherance of this conspiracy, plaintiffs claim that defendants engaged in the following acts:

discussed prices being charged for bulk extruded graphite; agreed to raise, fix or maintain prices

for bulk extruded graphite; raised, fixed and maintained prices for bulk extruded graphite;

directed employees to contact their counterparts and obtain support on general price increases for

bulk extruded graphite; discussed and agreed on general price increases for bulk extruded

graphite; approved and issued general price increases for bulk extruded graphite; monitored and

NOT FOR PUBLICATION

enforced adherence to the agreed upon prices for bulk extruded graphite; allocated markets

and/or customers in certain geographic locations among themselves and their co-conspirators to

avoid free and open competition; and agreed to eliminate discounts.

The alleged price-fixing conspiracy has been investigated by the United States

Department of Justice ("DOJ"), the European Union, the Canadian Competition Authority, and

other international authorities.  The initial investigations concerned graphite electrodes.  Some of

the defendants pled guilty in 1999 in the Eastern District of Pennsylvania to price-fixing charges

with respect to graphite electrodes.  The defendants were fined $135 million for their

participation in the conspiracy.  As part of their plea agreement, the companies were released

from criminal liability for related graphite products, such as isostatic graphite and extruded

graphite.  The DOJ brought criminal proceedings against other manufacturers of isostatic

graphite and obtained guilty pleas.  In December of 2002, the European Commission announced

the results of its investigation into anti-competitive practices in the extruded graphite

industry, and named SGL AG and UCAR as participants in an extruded graphite cartel.

The first class action complaint against defendants was filed on December 18, 2002.

Four additional class action complaints alleging anti-competitive conduct by defendants in the

extruded graphite market were filed shortly thereafter, and the Amended Complaint was filed on

April 29, 2003.  Plaintiffs seek treble damages under Section 1 of the Sherman Act, 15 U.S.C. §

1, costs, attorneys' fees, and injunctive relief.  On October 28, 2004, this Court denied defendants

SGL US's, SGL Carbon AG's, and SGL Carbon GmbH's motions to dismiss the Amended

NOT FOR PUBLICATION

Complaint. In re: Bulk [Extruded] Graphite Products Antitrust Litigation, No. 02-6030, slip op.

at 1 (D.N.J. October 28, 2004).

Plaintiffs propose the following class of direct purchasers of bulk extruded graphite (the

"Class"):

> All persons (excluding federal government entities, defendants, and their
> respective parents, subsidiaries, and affiliates) who purchased Bulk Extruded
> Graphite Products in the United States, directly from the defendants, their
> affiliates or subsidiaries, during the period January 1, 1993 through December 31,
> 1998.

Plaintiffs allege that all members of the proposed class purchased such products directly from

one or more of the named defendants.

## STANDARD

A plaintiff seeking class certification bears the burden of proving that the action satisfies

the four threshold requirements of Federal Rule of Civil Procedure 23(a) and also falls within

one of the three categories of Rule 23(b).  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir.1994).

Fed.R.Civ.P. 23(a) states the threshold requirements for all class actions.  Under Rule 23(a), a

class may be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).  Rule 23(b) sets forth the three varieties of class actions contemplated by

Fed.R.Civ.P. 23.  Plaintiffs in this action invoke Rule 23(b)(3), which permits class certification

when the court finds that "questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and that a class action is

**NOT FOR PUBLICATION**

superior to other available methods for the fair and efficient adjudication of the controversy."

Fed.R.Civ.P. 23(b)(3).  Rule 23 and modern class action practice in the federal courts have their

roots in equity, Ortiz v. Fiberboard Corp., 527 U.S. 815, 832-33 (1999), and this Court must

exercise its discretion in ruling on a motion to certify.  In re Fine Paper Antitrust Litig., 685 F.2d

810, 822 (3d Cir. 1982), cert. denied sub nom., Alaska v. Boise Cascade, 459 U.S. 1156 (1983).

      The Third Circuit has held that the "interests of justice require that in a doubtful case ...

any error, if there is to be one, should be committed in favor of allowing a class action."

Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), cert. denied, 474 U.S. 946 (1985). The

Eisenberg court made this statement with reference to securities class actions and expressly

linked it to the lack of alternatives to enforcing the securities laws.  However, this holding of

Eisenberg has been relied upon in other areas as well, including antitrust.  E.g., In re Flat Glass

Antitrust Litig., 191 F.R.D 472, 476 (W.D. Pa. 1999); In re Chlorine & Caustic Soda Antitrust

Litig., 116 F.R.D. 622, 624-25 (E.D. Pa. 1987); see also In re The Prudential Ins. Co. of Am.

Sales Practices Litig., 962 F. Supp. 450, 508 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998),

cert. denied sub nom., Krell v. Prudential Ins. Co. of Am., 525 U.S. 1114 (1999).

      Indeed, it has been held that price fixing cases may be well-suited for class certification,

in the right circumstances.  Alabama v. Blue Bird Body Co., 573 F.2d 309, 322 (5th Cir. 1978);

TransAmerican Refining Corp. v. Dravo Corp., 130 F.R.D. 70, 75 (S.D. Tex. 1990) ("most price-

fixing cases are suitable for class action"); Alabama v. Chevron USA, Inc., 1980 U.S. Dist.

LEXIS 10616, 1980 WL 1808, at *1 (M.D. Ala. Jan. 11, 1980) ("widely recognized that antitrust

price-fixing cases are particularly suitable for class action treatment"); see Sheldon R. Shapiro,

**NOT FOR PUBLICATION**

Annotation: Propriety under Rules 23(a) and 23(b) of Fed. R. Civ. P., as amended in 1966, of

Class Actions for Violation of Federal Antitrust Laws, 6 A.L.R. Fed. 19, 24 (1971) ("a

substantial majority of the cases have held that under the circumstances antitrust class actions

were maintainable").  While there should not be a presumption in favor of certification, the Court

"must bear in mind that the rationale of Eisenberg with respect to class actions as necessary to

enforce the securities laws also applies here, and that the antitrust class action is an important

component in the federal scheme for deterring anti-competitive behavior."  In re Mercedes-Benz

Antitrust Litig., 213 F.R.D. 180, 184 (D.N.J. 2003).

A class certification decision requires a thorough examination of the factual and legal

allegations.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir.

2001) (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir.1998), cert. denied, 526

U.S. 1114 (1999)).  For this purpose, "it may be necessary for the court to probe behind the

pleadings before coming to rest on the certification question."  Newton, 259 F.3d at 166 (quoting

General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982); see also Amchem Prods.,

Inc. v. Windsor, 521 U.S. 591, 634-35 (1997) (Breyer, J., concurring in part and dissenting in

part); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1785, p. 16 (West

Supp.2000)). "Before deciding whether to allow a case to proceed as a class action, ... [courts]

should make whatever factual and legal inquiries are necessary under Rule 23."  Newton, 259

F.3d at 166 (quoting Szabo v. Bridgeport Machs. Inc., 249 F.3d 672, 676 (7th Cir. 2001); see also

5 Moore's Federal Practice § 23.46[4] ("[B]ecause the determination of a certification request

invariably involves some examination of factual and legal issues underlying the plaintiffs' cause

NOT FOR PUBLICATION

of action, a court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.") (footnotes omitted)).  However, "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974).

## DISCUSSION

I.      **Fed.R.Civ.P. 23(a) Requirements**

A.      **Rule 23(a)(1) - Numerosity**

"The numerosity requirement is intended to limit the class action device to those cases in which the number of parties makes traditional joinder of parties unworkable."  In re Mercedes-Benz, 213 F.R.D. at 184.  "There is no magic number which satisfies the numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members."  In re Plastic Cutlery Antitrust Litig., 1998 WL 135703, at *2 (E.D.Pa. Mar. 20, 1998) (citation omitted).  A court "may accept common sense assumptions" in finding that numerosity has been met."  Id. (citation omitted).

Plaintiffs estimate that there are approximately 1,000 direct purchasers included within the putative class rendering joinder impracticable.  (Beyer Aff. at ¶ 27 n. 17).  Defendants have not disputed that the proposed class satisfies the numerosity requirement, and the Court finds that plaintiffs have satisfied this requirement.

B.      **Rule 23(a)(2) - Commonality**

**NOT FOR PUBLICATION**

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that there exist "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Johnston v. HBO Film Management, Inc., 265 F.3d 178, 184 (3d Cir. 2001) (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 310 (3d Cir. 1998).

In this case, the existence, scope and efficacy of the conspiracy to fix or stabilize prices of bulk extruded graphite sold in the United States are common questions that satisfy the requirements of Fed.R.Civ.P. 23(a)(2). See In re Mercedes-Benz, 213 F.R.D. at 184 ("common questions exist[] concerning the existence of the alleged conspiracy and how it worked."). Defendants have not disputed that plaintiffs have satisfied the commonality requirement.

**C.       Rule 23(a)(3) - Typicality**

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class...." Fed.R.Civ.P. 23(a)(3). "Typicality asks whether the named plaintiff claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Baby Neal, 43 F.3d at 55. In evaluating typicality, the Court should consider whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Eisenberg, 766 F.2d at 786 (citation omitted). A finding of typicality will generally not be precluded even if there are "pronounced factual differences" where there is a strong similarity of

-9-

NOT FOR PUBLICATION

legal theories.  Baby Neal, 43 F.3d at 58 (citation omitted).  "In antitrust disputes 'since the representative parties need prove a conspiracy, its effectuation, and damages therefrom-- precisely, what the absentees must prove to recover--the representative claims can hardly be considered atypical.'"  In re Sugar Indus., 73 F.R.D. 322, 336 (E.D. Pa. 1976) (quoting Minnesota v. United States Steel Corp., 44 F.R.D. 559, 567 (D. Minn. 1968)).

Plaintiffs argue that in this case, all members of the putative class have purchased bulk extruded graphite directly from the defendants.  They add that the claims of the proposed class are typical because they arise from the same events or course of conduct and are based on the same legal theory as the antitrust claims of other class members.  See Jerry Enterprises of Gloucester Counter, Inc. V. Allied Bev. Group, L.L.C., 178 F.R.D. 437, 442 (D.N.J. 1998) (typicality satisfied where "claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members").  Specifically, plaintiffs claim all members of the plaintiff class purchased extruded bulk extruded graphite at prices artificially inflated as a result of defendants' price-fixing conspiracy, and seek redress for the overcharges they paid as a result thereof.

Defendants argue that the plaintiffs have not satisfied the requirement of typicality.  They argue that the proposed class representatives are machine shops that compete directly with SGL US and UCAR, two named defendants that are sellers of bulk extruded graphite.  By contrast, the other members of the putative class are end users and OEMs, purchasers that are direct customers of both the alleged conspirators and the proposed class representatives.  In other words, the different categories of class members have different purchasing positions.  Defendants add that

-10-

**NOT FOR PUBLICATION**

the different purchasing positions are evidenced by the differences in prices paid by machine

shops, on one hand, and end users and OEMs on the other.

Defendants' argument, however, fails to demonstrate how the class representatives'

*claims* are atypical of the proposed plaintiffs' class.  That the proposed class representatives had

different purchasing positions from end user and OEM class members does not mean that the

class representatives' claims are atypical, considering that all members of the proposed plaintiffs'

class have alleged that they purchased bulk extruded graphite from the defendants at a price that

was inflated as a result of the horizontal price-fixing conspiracy.  See In re Sumitomo Copper

Litigation, 182 F.R.D. 85, 92 (S.D.N.Y.,1998) ("factual differences in the amount of damages,

date, size or manner of purchase, the type of purchaser, the presence of both purchasers and

sellers, and other such concerns will not defeat class action certification when plaintiffs allege

that the same unlawful course of conduct affected all members of the proposed class") (citing

Green v. Wolf, 406 F.2d 291, 299-301 (2d Cir.1968)).  Defendants have not shown that the

proposed plaintiff class representatives' claims are atypical of the claims of the entire proposed

plaintiff class.  The typicality requirement is satisfied.

    **D.**    **Rule 23(a)(4) - Adequacy of Representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class."  Fed.R.Civ.P. 23(a)(4).  The adequacy requirement seeks first to "test[]

the qualifications of the counsel to represent the class."  In re Prudential, 148 F.3d at 312

(citations omitted).  Second, the requirement seeks to "uncover conflicts of interest between

named parties and the class they seek to represent." Id. (citations omitted).  Plaintiffs note that

**NOT FOR PUBLICATION**

the plaintiff class is adequately represented by experienced counsel thoroughly familiar with the case and antitrust litigation, and plaintiffs' counsel has vigorously prosecuted the case to date. Plaintiffs add that there are no conflicts between the proposed class representatives and class members with respect to the subject matter of this litigation.

Defendants do not contest the qualifications of plaintiffs' counsel, but rather argue that there are conflicts of interest between the class representatives and other purchasers of bulk extruded graphite.  As mentioned earlier, defendants have argued that machine shops, such as the proposed class representatives, are not only purchasers of bulk extruded graphite, but are also direct competitors of manufacturers - such as SGL US and UCAR - in the market for machined extruded graphite. Machine shops and manufacturers both aim to sell bulk extruded graphite to end users and OEMs.  At the same time, however, the proposed class representatives seek to stand in the shoes of absent class members such as end users and OEMs who are their customers, and with whom they have an arm's length relationship.

Defendants cite three possible conflicts that may arise between the proposed class representatives and the absent end user and OEM class members.  First, the proposed class representatives have an incentive to use this litigation to their advantage in their competition with SGL US, potentially at the expense of the interests of other (non-machine shop) members of the class.  As example, the class representatives may use this litigation to bludgeon the SGL defendants to make them look bad in the eyes of SGL US's other customers (end users and OEMs), even though the end users and OEMs might prefer a quicker settlement.  Second, because they are competitors of SGL US, the machine shops are likely to be much more resistant

-12-

NOT FOR PUBLICATION

than end users and other customers to the possibility of a settlement involving price adjustments in future sales. Third, the pricing and marketing strategy for machine shops differed from the pricing and marketing strategy for other customers, so there is a built-in tension between what the machine shops need to prove to establish liability and what the other class members need to prove. Defendants conclude that such potential conflicts disqualify the plaintiffs from serving in a class representative capacity, and cite several cases to support this point: Bradburn Parent/Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.), No. (Civ.) 02-7676, 2004 WL 414047, at *3 (E.D.Pa. Mar. 1, 2004) ("adequacy of representation requirement is not satisfied where 'the named representatives interests in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members.'") (citation omitted); Am/Comm Systems, Inc. v. American Tel. And Tel. Co., 101 F.R.D. 317, 322 (E.D.Pa. 1984) (denying class certification because of antagonistic interests between the representative plaintiffs and the proposed class); Franklin Container Corp. v. Int'l Paper Co., No. 77-3204, 1982 WL 1958, at **2-3 (E.D.Pa. May 12, 1982) (holding that named plaintiffs were not typical of putative class members and could not adequately represent the interests of the proposed class where proposed class included competitors of defendants).

Defendants' cases, however, are easily distinguished from these scenarios. Bradburn stands for the proposition that when class members are competitors in a limited market, the class should not be certified. Bradburn, 2004 WL 414047, at *3. The Court was concerned that the proposed class representatives' interests in maximizing their own recovery would create a strong incentive to minimize the recovery of other class members. Bradburn Parent/Teacher Store, Inc.,

NOT FOR PUBLICATION

2004 WL 414047, at *3 (citing Yeager's Fuel v. Pennsylvania Power & Light Co., 162 F.R.D.

471, 478 (E.D.Pa.1995) ("Yeager II")).  That is not the case here.  Rather, according to the

defendants' own argument, the proposed class representatives are in competition with SGL US,

not with the other class members.  (Defs' Opp. at p. 26).

 Similarly, in both Am/Comm Systems, Inc. and Franklin Container Corp., the courts

precluded class certification on the grounds that the proposed class representatives interests were

clearly antagonistic to the other class members, in that the class representatives could only

maximize their damages recovery at the expense of their fellow class members/competitors.

Am/Comm Systems, Inc., 101 F.R.D. at 322; Franklin Container Corp., 1982 WL 1958, at *3.

Central to these decisions were the courts' findings that the markets for telephone terminal

equipment and corrugated boxes, respectively, were limited.  Because the plaintiffs were in direct

competition with other potential class members, the plaintiffs could only recover damages by

showing that they lost profits, and that their competitors did not.  Here, potential damages are not

limited to lost profits or market share.  In other words, class members would not be limited to

recovering damages at the expense of other class members.

 Indeed, courts are generally skeptical of defenses to class certification based on conflicts

between the proposed class members. "The mere fact that a representative plaintiff stands in a

different factual posture is not sufficient to refuse certification...[t]he atypicality or conflict must

be clear and must be such that the interests of the class are placed in significant jeopardy."

Hedges Enters., Inc. v. Continental Group, Inc., 81 F.R.D. 461, 466 (E.D.Pa. 1979) (citation

omitted).  Courts have "generally declined to consider conflicts, particularly as they regard

-14-

NOT FOR PUBLICATION

damages, sufficient to defeat class action status at the outset unless the conflict is apparent,

imminent, and on an issue at the very heart of the suit."  In re NASDAQ Market-Makers

Antitrust Litig., 169 F.R.D. 493, 514 (S.D.N.Y. 1996).  Such arguments are unavailing except in

the rarest of cases where a conflict is "so palpable as to outweigh the substantial interest of every

class member in proceeding with the litigation." Id. at 514-15.  Although present defendants have

argued that there are various potential conflicts that may arise from permitting the proposed class

representatives to proceed with this action, the evidence of a conflict between class members is

not, at this point in the case, apparent, imminent, and so palpable as to outweigh the substantial

interest of every class member in proceeding with the litigation.  Plaintiffs have satisfied the

adequacy of representation requirement.  All the requirements of Rule 23(a)(3) for class

certification have been satisfied.

**II.    Fed.R.Civ.P. 23(b)(3) Requirements**

        The second part of the test for class certification asks this Court to determine whether

"questions of law or fact common to the members of the class predominate over any questions

affecting only individual members," and whether "a class action is superior to other available

methods for the fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b)(3).

        A.    Do common questions of law and fact predominate?

        "Predominance requires that the common issues be both numerically and qualitatively

substantial in relation to the issues peculiar to individual class members."  In re Mercedes-Benz ,

213 F.R.D. at 186.  "The mere existence of individual issues will not of itself defeat class

certification." Id. (citing Weisfeld v.Sun Chem. Corp., 210 F.R.D. 136, 141 (D.N.J. 2002)).

-15-

NOT FOR PUBLICATION

"The Court must determine whether the common legal and factual issues are more significant than the non-common issues such that the class is 'sufficiently cohesive to warrant adjudication by representation.'" Id. (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). While there is no definitive test for determining whether common issues predominate, in general, predominance is met "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." In re Vitamins Antitrust Litig., 209 F.R.D. 251, 262 (D.D.C. 2002) (citing In re Potash Antitrust Litig., 159 F.R.D. 692, 693 (D.Minn. 1995). To receive class certification in this case, plaintiffs must establish predominance of common issues for each of three key elements: (1) violation of the antitrust laws; (2) the fact of the antitrust injury or "impact" on the plaintiffs; and (3) the amount of damages suffered by each class member. Danny Kresky Enters. Corp. v. Magid, 716 F.2d 206, 209 (3d Cir. 1983).

        1.      Antitrust Violation

        Common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members. In re Flat Glass, 191 F.R.D. at 484. Common issues of law and fact will predominate with respect to the "antitrust violation" element of the plaintiffs' case if there is "commonality amongst the plaintiffs of proof of the conspiracy and [] acts taken in furtherance of it" by the defendants. In re Mercedes-Benz, 213 F.R.D. at 187. It has frequently been found that "whether a conspiracy exists is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1781 at 228 (3d

-16-

**NOT FOR PUBLICATION**

ed. 2005); see also 6 Newberg on Class Actions, § 18.28 at 102 (4th ed. 2002) ("As a rule, the

allegation of a price-fixing conspiracy is sufficient to establish predominance of common

questions.").

Plaintiffs here allege that the defendants fix[ed], raise[d], stabilize[d] and maintain[ed] at

artificially high levels the prices they charged for bulk extruded graphite products in the United

States and elsewhere. (Amended Complaint at ¶¶ 36-38). To prove these violations, all class

members will need to demonstrate that the defendants engaged in a conspiracy to fix prices, in

violation of the Sherman Act. This would require common proof. Accordingly, common issues

of fact and law predominate on the issue of antitrust violation.

> 2. *Antitrust Impact*

The critical issue of this motion is whether common issues predominate with respect to

the issue of antitrust injury or "impact."[2] Plaintiffs have submitted an affidavit of their expert,

Dr. John C. Beyer, to show that methodologies exist that can be used to demonstrate impact and

damages on a class-wide basis.[3] Dr. Beyer concludes in his affidavit that accepting the

conspiracy allegations of the Amended Complaint as true, there would be class-wide impact and

injury shown by generalized class-wide evidence, and there exist formulaic methodologies to

calculate damages. Defendants argue that plaintiffs cannot show common proof of impact. They

contend that the different prices charged by the alleged conspirators to different customers for the

---

[2]"Antitrust impact" is sometimes referred to as "fact of damage" or "fact of injury."

[3]Dr. John C. Beyer is President of Nathan Associates, an economic and financial
consulting firm established in 1946.

NOT FOR PUBLICATION

same products, the hundreds of different parts sold during the relevant period, and the availability

of alternative suppliers and products are all factors that negate the existence (and proof) of

antitrust impact common to the putative class.  (Defs' Opp. at pp. 10-11).

 "Antitrust injury" is the "fact of damage" that results from a violation of the antitrust

laws.  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d. Cir. 1977).  "[The] burden of proving

the fact of damage under §4 of the Clayton Act is satisfied by...proof of some damage flowing

from the unlawful conspiracy...."  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100,

114 n. 9 (1969).  In Bogosian, the Third Circuit stated that "proof of impact [may] be made on a

common basis so long as the common proof adequately demonstrates some damage to each

individual."  Bogosian, 561 F.2d at 454.  But, "[w]hether or not fact of damage can be proven on

a common basis [] depends upon the circumstances of each case." Id.  "The damage alleged

must show that each individual suffered 'injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful.'" Weisfeld, 210 F.R.D.

at 142 (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

 The operative question here is not whether the plaintiffs can establish class-wide impact,

but whether class-wide impact may be proven by evidence common to all class members.  In re

Mercedes-Benz, 213 F.R.D. at 190.  The plaintiffs do not need to establish at this time that they

have in hand all of the common evidence necessary to establish class-wide impact. Id.  Rather,

"Plaintiffs need only make a threshold showing that the element of impact will predominantly

involve generalized issues of proof, rather than questions which are particular to each member of

the plaintiff class."  In re Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002) (citing In

-18-

**NOT FOR PUBLICATION**

re Linerboard, 203 F.R.D. 197, 220 (E.D.Pa. 2001)).  Whatever methodology is used, for impact

to be proven on a class-wide basis, the common proof must adequately demonstrate damage to

each individual.  Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136, 143 (D.N.J. 2002) (citing

Newton, 259 F.3d at 180 n.21 (3d. Cir. 2001) (internal quotations omitted)).

        Antitrust defendants resisting class certification routinely argue that the complexity of

their particular industry makes it impossible for common proofs to predominate on the issue of

antitrust impact.  In re Mercedes-Benz, 213 F.R.D. at 187 (citations omitted).  Evaluating this

contention requires an examination of the industry involved, In re Industrial Diamonds Antitrust

Litig., 167 F.R.D. 374, 382 (S.D.N.Y. 1996), but the argument "is usually rejected where the

conspiracy issue is the overriding one."  In re Glassine & Greaseproof Paper Antitrust Litig., 88

F.R.D. 302, 306 (D.C. Pa. 1980).  Indeed, courts have frequently found common impact in cases

alleging price-fixing, despite the presence of individual negotiations, varied purchase methods

and different amounts, prices, and types of products purchased.  As one court has stated:

> As long as the existence of a conspiracy is the overriding question, then the class
> has met its predominance requirement . . . . To prove injury, plaintiffs need only
> demonstrate they have suffered some damage from the unlawful conspiracy . . . .
> Such a showing may be made on a class basis if the evidence demonstrates that
> the conspiracy succeeded in increasing prices above the competitive level.

In re Workers' Compensation, 130 F.R.D 99, 109 (D.Minn. 1990) (citations omitted); accord In

re Plywood Antitrust Litig., 76 F.R.D. 570, 584 (E.D. La. 1976) ("If the members of each of the

classes prove they purchased softwood plywood during the relevant period and that defendants

conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that

the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host

NOT FOR PUBLICATION

of individual issues which destroys the requisite predominance of questions common to the classes."); In re Flat Glass, 191 F.R.D. at 486 ("More importantly, the proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members. Therefore, even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated this would establish at least the fact of damage, even if the extent of damage by each plaintiff varied.").

In Bogosian, the Third Circuit created the "Bogosian short-cut" to deal with the question of impact when there are multiple variables affecting the price paid by the plaintiffs. Bogosian, 561 F.2d at 434. The Third Circuit had been asked to review the District Court's determination that fact of damage would have to be proved on an individual basis. Id. at 454. In response, the panel wrote:

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage....Under these circumstances proof on a common basis would be appropriate.

Bogosian, 561 F.2d at 455. The Circuit later reaffirmed this holding in In re Linerboard, 305 F.3d at 145. Linerboard concerned the alleged manipulation by defendants of the supply of corrugated paper by conspiring to cut production. The Circuit found that evidence of

-20-

NOT FOR PUBLICATION

manipulation of supply, combined with the law of supply and demand, would establish that the

class members paid artificially high prices and constituted evidence of antitrust impact to the

plaintiff class under the <u>Bogosian</u> short-cut.  Properly understood, the presumption (or "short-

cut") means that "even if issues requiring individualized proof are present, evidence of a

common antitrust injury to every class member flowing from an alleged antitrust violation can, in

certain circumstances, satisfy the requirements of Rule 23(b)(3)."  <u>Weisfeld v. Sun Chem Corp.</u>,

84 Fed. Appx. 257, 261, 2004 U.S. App. Lexis 277, at *9 (3d Cir. Jan. 9, 2004).

 While plaintiffs here argue that there is a presumption of impact, they do not rely solely

on this presumption.  This is known as the "belt and suspenders" rationale.  As the Third Circuit

stated in <u>Linerboard</u>,

> The district court used a belt and suspenders rationale to support its conclusion that
> the putative class had met its burden of showing impact. In addition to relying on
> the <u>Bogosian</u> short cut, it credited the testimony of plaintiffs' experts, opinions that
> were supported by charts, studies and articles from leading trade publications.
> These experts suggested that advanced econometric models could be effectively
> prepared to establish class-wide impact.

<u>In re Linerboard</u>, 305 F.3d at 153.  Here, plaintiffs claim to demonstrate through Dr. Beyer's

affidavit that, accepting the conspiracy allegations of the complaint as true, class-wide impact

and injury can be shown through generalized class-wide evidence, and add that there exist

formulaic methodologies to calculate damages.[4]

 Dr. Beyer has examined the extruded graphite industry to determine if the plaintiffs

would have suffered impact as a result of the alleged collusive behavior.  First, he has noted that

---

 [4]It is also worth noting that Dr. Beyer's analysis was used in both the <u>Mercedes-Benz</u> and
<u>Linerboard</u> cases.

**NOT FOR PUBLICATION**

SGL and UCAR account for approximately 80 percent of the market of sales of bulk extruded graphite. (Beyer Aff. at ¶13).  He adds that extruded graphite products can be considered undifferentiated commodities with a high degree of product interchangeability.  (Beyer Aff. at ¶21). In support of his claim that extruded graphite is commodity-like, Dr. Beyer notes that plaintiffs' representatives have indicated that various grades of bulk extruded graphite are substitutable across defendants. (Beyer Aff. at ¶ 22).  Defendants use branding, in the form of company specific labels, in an attempt to differentiate their products from those of rival firms. (Beyer Aff. at ¶ 22).  Because these products are commodity-like, he argues that they can be easily substituted for by other manufacturer's products.  Id.

       With commodity-like products, Dr. Beyer claims that sellers normally compete with each other on the basis of price. Id.  When combining the fact that defendants controlled 80% of the market of bulk extruded graphite sales with the fact that bulk extruded graphite is a commodity-like product, Dr. Beyer concludes that in the absence of the alleged coordinated behavior among the defendants, all members of the proposed class would have benefitted from price competition among defendants.  Id.

       Dr. Beyer adds that defendants circulated price lists amongst each other that show similar price increases in close proximity to one another, throughout the class period.  (Beyer Aff. at ¶24).  Given the importance of price lists and price increase announcements in this industry, Dr. Beyer determined that, assuming the allegations of the conspiracy are true, members of the proposed class would have been impacted on a class-wide basis.  Id.  He also notes that an analysis of defendants' electronic transaction databases, containing company level sales

NOT FOR PUBLICATION

transactions, indicates that there is a "pricing structure," or "structure to pricing," for bulk

extruded graphite, meaning the various grades of bulk extruded graphite are affected by the same

or similar forces of demand and supply.[5] (Beyer Aff. at ¶26-27).  Dr. Beyer has graphed prices to

show that SGL and UCAR's prices moved together over time and were frequently identical.

(Beyer Aff. at ¶28).

      Dr. Beyer concludes that the alleged conspiracy would have resulted in all class members

paying higher prices for bulk extruded graphite than they would have absent the alleged

conspiracy. (Beyer Aff. at ¶29).  There are several reasons he provides for this finding.  First, this

conclusion is based on his finding that the production of bulk extruded graphite is concentrated

with the Defendants accounting for roughly 80 percent of the industry's annual sales, and 100

percent of the industry's Tier 1 (highest quality bulk graphite) sales. Id. Given the degree of

market concentration, members of the proposed class would have been unable to switch between

suppliers to avoid the price effects of the alleged conspiracy.  Id.  Second, because bulk extruded

graphite is commodity-like in nature, in the absence of the alleged conspiracy, members of the

proposed Class could have switched among suppliers based on differences in prices.  Id.  As a

result, a conspiracy that lessens competition would have impacted the price of bulk extruded

graphite across all product grades, and hence all customers.  Id.  Third, Dr. Beyer claims his

empirical analysis of defendants' pricing practices confirms that the alleged conspiracy would

have impacted all parties.  Id.  Dr. Beyer says he can show class-wide impact and damages

_____

     [5]The electronic data produced by UCAR covers the period January 1990 through
December 2001, and the electronic data produced by SGL covers the period January 1995
through December 2001.  (Beyer Aff. at ¶ 27).

**NOT FOR PUBLICATION**

through the use of multiple regression and benchmark (also known as yardstick) methodologies.[6]
(Beyer Aff. at ¶¶30-32).

      The Court finds that the plaintiffs have adduced sufficient evidence and a plausible theory
to convince it that class-wide impact may be shown through generalized evidence common to the
plaintiffs' class. "[T]he proof plaintiffs must adduce to establish a conspiracy to fix prices, and
that defendants base price was higher than it would have been absent the conspiracy, would be
common to all class members." In re Flat Glass, 191 F.R.D. at 486. The plaintiffs' expert has
offered an opinion from his supporting data that is bolstered by charts and graphs. See In re
Linerboard, 305 F.3d at 153-55 (in affirming class certification decision, Third Circuit found it
compelling that plaintiffs' experts had "effectively utilized supporting data, including charts and
exhibits, to authenticate their professional opinions that all class members would incur such
damages."). Moreover, plaintiffs have proposed using multiple regression and benchmark
methodologies to prove antitrust impact. Both methodologies have been approved by this
Circuit. Id. at 153-54.

      Defendants dispute the testimony of Dr. Beyer, specifically, his conclusions that (1) the
market for bulk extruded graphite products is homogenous, meaning that bulk extruded graphite
products exhibit fungible, "commodity-like" characteristics, the only competition among

---

      [6]The benchmark method determines benchmark prices for bulk extruded graphite before
and after the conspiracy, and compares them to the prices during the conspiracy. Multiple
regression analysis identifies the elements of the price attributable to normal market factors, such
as supply, demand, and elements of price that cannot be explained as a result of such legitimate
market factors and are, as a result, attributable to the price-fixing conspiracy. Both benchmark
analysis and multiple regression analysis have been approved by the Third Circuit. Mercedes-
Benz, 213 F.R.D. at 189-90; Linerboard, 305 F.3d at 151, 153-54.

NOT FOR PUBLICATION

manufacturers existing on the basis of price; and (2) during the relevant period, SGL US and

UCAR circulated price lists and price increase announcements that were similar to and in close

temporal proximity to each other, and, consequently, putative class members did not benefit from

genuine price competition. (Defs' Opp. at 11).  Defendants argue that each of these points is

factually incorrect, because the market for bulk extruded graphite is not homogenous, and prices

varied widely.  Defendants also contend that price was not the only consideration that affected

customers' purchasing decisions; the evidence in the record shows there were viable substitutes

both within and outside the relevant market; and competition in the bulk extruded graphite

market was not limited to SGL US and UCAR.  Finally, defendants argue that plaintiffs have

failed to show that class-wide impact can be proved by using common proof.

It must remembered, however, that during the class certification stage, the Court's role is

to determine whether the plaintiffs have made a sufficient showing that the evidence they intend

to present concerning antitrust impact will be made using generalized proof common to the class

and that these common issues will predominate over individualized issues.  See e.g., In re

Mercedes-Benz, 213 F.R.D. at 190 (at class certification stage, plaintiffs' burden under

Fed.R.Civ.P. 23(b)(3) is to "adduce sufficient evidence and a plausible theory to convince the

Court that class-wide impact may be proven by evidence common to all class members.") "The

Court is not to conduct a preliminary inquiry into the merits of plaintiffs case." In re Mercedes-

Benz, 213 F.R.D. at 190 (citing Eisen, 417 U.S. at 178).  Consequently, the Court is not in a

position at the class certification stage to weigh the arguments of the plaintiffs' expert and the

defendants' expert.  E.g., In re Vitamins Antitrust Litig., 209 F.R.D. 251, 267-68 (D.D.C. 2002)

NOT FOR PUBLICATION

(refusing to weigh, at class certification stage, conflicting testimony of the plaintiffs' expert and the defendants' expert).  Whether the market for bulk extruded graphite products is homogenous and whether prices varied widely are substantive issues that go to the merits of the case, and are to be resolved by the fact finder.  Nor is the Court is required to determine at this time whether multiple regression and benchmark analysis can properly be applied in this case to show fact of damages.  See, e.g., In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555, 565 (S.D.N.Y. 2004) ("At this stage, Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis....While Defendants take issue with Plaintiffs' methodology, this Court need not evaluate whether Plaintiffs' theories are likely to prevail at trial.") (quoting In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 138 (2d Cir. 2001)); In re Flat Glass, 191 F.R.D. at 487 ("At this point of the proceedings, it would be improper to make a determination as to the likely success of using a multiple regression analysis. Rather, we need only concern ourselves with whether plaintiffs have identified a valid method for determining damages, which they have.").  Accordingly, defendants' arguments are insufficient to defeat the plaintiffs' motion for class certification.  Plaintiffs have satisfied the threshold of showing predominance of common issues with respect to antitrust injury.[7]

       3.     *Amount of Damages*

---

[7] If, at a later time, it becomes apparent to the court that there are problems in proving damages that outweigh advantages of class certification, the Court can, at a later date, pursuant to Fed.R.Civ.P. 23(c)(4)(A) give appropriate consideration of a class limited to the determination of liability. See Bogosian, 561 F.2d at 456.

**NOT FOR PUBLICATION**

About damages, the Third Circuit has opined that "[b]ecause separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device." In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 817 (3d Cir. 1995) (citing Eisenberg, 766 F.2d at 786), cert. denied, 516 U.S. 824 (1995). See In re Flat Glass, 191 F.R.D. at 487 (citing same). It has also been recognized that "some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." In re Flat Glass, 191 F.R.D. at 487 (quoting 4 Newberg on Class Actions § 18.27, at 4S-16 (3d ed. Supp. 1998)).

Plaintiffs have proposed using "benchmark" and "multiple-regression" analysis to estimate damages in this case. (Beyer Aff. at ¶¶ 30-32). Both of these methods are widely accepted, and have been recognized by the Third Circuit as a means of proving impact and estimating damages. In re Linerboard, 305 F.3d at 153-54. Although individual issues may arise in calculating damages, this fact does not defeat class certification. See In re Flat Glass, 191 F.R.D. at 487 (citing Bogosian, 561 F.2d at 456).

B.      Is a class action superior to alternative methods of adjudication?

The second part of Rule 23(b)(3) requires the plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). When conducting the superiority analysis, a court must consider the following factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

-27-

**NOT FOR PUBLICATION**

> concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Courts should be mindful, too, that litigation of related claims in one forum is generally preferable. See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 351 (D.N.J. 1997).

Plaintiffs have only touched on this issue by arguing that a class action is superior to other available methods because of the prohibitive and duplicative expense of prosecuting and trying the claims of thousands of geographically dispersed class members on a non-class basis. They also argue that the court has a variety of procedural options at its disposal to deal with management issues should they arise. Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (noting that "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues"). Defendants have not directly addressed the superiority requirement in their brief.

The Court finds that a class action is the superior method for adjudication of the plaintiff class members' claims. In this case, the factors listed in Rule 23(b)(3), on balance, favor certification. Although defendants' claim that 83 percent of the purchases were made by one customer, there has been no indication that this party (whoever it may be), would favor prosecuting this action independently. Moreover, the relatively small purchase price of bulk extruded graphite parts would likely preclude litigating this action outside a class action.[8] See In

_____

[8]As an example of the price of bulk extruded graphite, defendants claim that the cost of SGL parts sold in 1995 ranged from $0.09 per unit to $14,100 per unit. (Cox Aff. at ¶19).

**NOT FOR PUBLICATION**

re GMC, 55 F.3d at 809 (discussing desirability of protecting uneconomically small claims).

      As to factor (B), the Court is not aware of any other litigation concerning this controversy commenced by or against a member of the class. As to factor (C), the Court finds it desirable to concentrate these claims in one forum, and sees no reason why it would be undesirable. Last, with respect to factor (D), the Court does not perceive any difficulties that will be encountered in managing the class action, with the possible exception of determining the amount of individual damages.  However, the Court has at its disposal a number of devices to assist it in determining individual damages.  See In re Mercedes-Benz, 213 F.R.D. at 192 (discussing possible devices that may be employed to determine individual damages calculations).  Rather than refuse certification on the unlikely possibility that damages calculations will overwhelm this Court, "that risk is better addressed down the road, if necessary."  In re Bally Mfg. Secs. Corp. Litig., 141 F.R.D. 262, 268 (N.D.Ill. 1992).  The Court finds that a class action is the superior method to adjudicate this dispute.

**CONCLUSION**

      For the foregoing reasons, the Court finds that plaintiffs have met their burden of satisfying the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3) for class certification.  Plaintiffs motion to certify the proposed plaintiffs' class is granted.


                                                  **s/William H. Walls**        
                                                  United States Senior District Judge

-29-