NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: BULK EXTRUDED GRAPHITE PRODUCTS ANTITRUST LITIGATION | **OPINION**<br><br>Civ. No. 02-6030 (WHW) |

**Walls, Senior District Judge**

Before the Court is defendants' motion for summary judgment. Pursuant to Fed. R. Civ. P. 78, the motion is decided without oral arguments. The motion is denied.

**FACT AND PROCEDURAL HISTORY**

Defendants SGL Carbon, LLC ("SGL US"), SGL Carbon AG ("SGL AG"), and SGL Carbon GmbH ("SGL GmbH") are sellers of bulk extruded graphite products.[1] Defendant Robert J. Koehler ("Koehler") is Chairman of the Board of Management of SGL AG. Defendants are alleged to have engaged in a world-wide conspiracy to fix, raise, stabilize and maintain at artificially high levels the prices charged for bulk extruded graphite products in the United States and elsewhere.

In December 2002, certain purchasers of bulk extruded graphite, Industrial Graphite, Inc.,

---

[1] An additional company, UCAR Carbon Company ("UCAR"), which is now known as GrafTech, was also named as a defendant in the Consolidated Amended Class Action Complaint ("Amended Complaint"). On March 8, 2004, this Court approved the settlement with UCAR.

NOT FOR PUBLICATION

Graphite Machining, Inc., Midwest Graphite Co., and Semco Carbon, filed a complaint, which alleged that defendants engaged in price fixing from as early as 1993. In April 2006, the Court certified the class of bulk extruded graphite purchasers represented by named plaintiffs.[2]

In May 2004, defendants moved to dismiss the action, arguing that it was time-barred under Section 4B of the Clayton Act. This section bars any private antitrust action not "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Though the present action had been brought more than four years after the plaintiffs' alleged initial injury, plaintiffs claimed that the statute of limitations was tolled because defendants fraudulently concealed their wrongdoing. In its October 28, 2004 opinion, this Court rejected defendants' argument that plaintiffs had insufficiently pled fraudulent concealment and denied their motion to dismiss. In its decision, the Court stated that once the factual record evolved, the issue of fraudulent concealment might better be determined.

Since that time, the parties have engaged in considerable discovery. In their motion for summary judgment, defendants once again bring the issue of fraudulent concealment before the court. They argue that plaintiffs' action must be dismissed because the action is time barred under 15 U.S.C. § 15(b).

## LEGAL STANDARD

### A. Summary Judgment

---

[2]The Court certified the following class: "All persons (excluding federal government entities, defendants, and their respective parents, subsidiaries, and affiliates) who purchased Bulk Extruded Graphite Products in the United States, directly from the defendants, their affiliates or subsidiaries, during the period January 1, 1993 through December 31, 1998." Class Certification Order, No. 02-6030, April 4, 2006.

**NOT FOR PUBLICATION**

Summary judgment is appropriate when the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only a genuine and material factual dispute between the parties will defeat a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could find for the non-moving party on that issue. It is material if, under the substantive law, that issue would affect the outcome of the suit. See id. at 248.

A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 323 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]" that show that there is no genuine material issue of fact as to the non-existence of that element. Id. at 323. When the burden of proof for a particular factual element falls on the non-moving party, the moving party must initially demonstrate that the non-moving party cannot meet its burden with the evidentiary material of record admissible at trial. See id. at 322-23.

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing

party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In so doing, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

### B. Fraudulent Concealment

The burden of establishing fraudulent concealment falls on the plaintiff who invokes that doctrine to toll the statute of limitations. Forbes v. Eagleson, 228 F.3d 471, 487 (3d. Cir. 1993). The plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178 -1179 (3d. Cir. 1993).

The defendant must affirmatively act to conceal the plaintiff's claim. The affirmative acts of concealment may be separate from the underlying price-fixing conspiracy or, if the conspiracy is self-concealing, the acts of concealment may be performed as part of the conspiracy itself. See In re Mercedes-Benz Anti-Trust Litig., 157 F.Supp.2d 355, 369 (D.N.J. 2001); Pennsylvania v. Milk Indus. Management Corp., 812 F. Supp. 500 (E.D. Pa. 1992). The statute of limitations is tolled "'until the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action . . . .'" Forbes v. Eagleson, 228 F.3d 471, 487 (3d Cir. 2000)

**NOT FOR PUBLICATION**

(quoting Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1392 (3d Cir. 1994)).

Courts should not toll the statute of limitation if the "antitrust causes of action 'were nonetheless discovered or could with reasonable diligence have been discovered notwithstanding such a concealment and well within the appropriate time for commencing such actions.'" Lower Lake Erie Iron Ore Antitrust Litig., 998 F. 2d at 1179 (quoting Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d at 1483 (6th Cir. 1988)). The plaintiff must exercise due diligence in investigating his cause of action. He may demonstrate this by either proving that he did in fact exercise reasonable diligence or by proving that a reasonably diligent plaintiff would not have had notice of his potential claim. Forbes, 228 F.3d at 487; In re Mercedes, 157 F.Supp.2d at 373.

**DISCUSSION**

Defendants argue that the statute of limitations should not be tolled for fraudulent concealment because plaintiffs had "reason to know of a possible claim more than four years before the complaint was filed." (Def.'s Memo. at 21.) They maintain plaintiffs "cannot prove they 'exercised due diligence in attempting to discover their claim.'" (Id. at 22.)[3]

To support their claim that the plaintiffs had reason to know of their claim before December 1998, defendants make the following assertions: (1) plaintiffs could and did perceive that SGL Carbon, LLC and UCAR had the same prices for bulk extruded graphite from 1993 to

---

[3]Defendants also argue that the action is time barred because the plaintiffs filed suit more than four years after any alleged act of concealment occurred. However, the statute of limitations begins to run when "the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action," Forbes, 228 F.3d at 487, not when the last act of concealment occurred. Defendants do not dispute that there exists a material issue of fact as to alleged acts of concealment before June 1997. (Def. Reply at 5.)

1996; (2) defendants' customers and certain plaintiffs made statements which demonstrated that before 1998 they had harbored suspicions that SGL Carbon, LLC and UCAR had worked together to set prices of bulk extruded graphite; (3) plaintiffs had access to public information regarding government investigations and settlements relating to price fixing in the graphite industry by the defendants and other corporations.

### A. Similarity of Defendants' Prices

According to defendants, a review of the 1993-1996 price announcements in evidence demonstrates that SGL Carbon LLC and UCAR increased their prices for bulk extruded graphite products by similar amounts during that time. They also offer deposition testimony of officers of the plaintiff corporations that these officers believed that different suppliers of bulk extruded graphite products sold comparable products at identical or similar prices.

Plaintiffs point out that parallel pricing does not, as a matter of antitrust law, establish price fixing. Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., 998 F.2d 1224, 1232 (3d Cir. 1993). Courts have held that knowledge of "apparent parallel price increases" is not sufficient to demonstrate that plaintiffs should have known that they had an antitrust cause of action. United Nat'l Records, Inc. v. MCA, Inc., 609 F.Supp. 33, 37 (N.D. Ill.,1984). See King & King Enterprises v. Champlin Petroleum Co., 657 F.2d 1147, 1156 (10th Cir.1981). The Third Circuit recognizes that it is common for similar products to be similarly priced in a competitive market. See In re Flat Glass Antitrust Litigation, 385 F. 3d 350, 359 (3d. Cir. 2004). In his deposition, a former UCAR executive, Robert Hart, expressed a similar view that parallel pricing is not necessarily a sign of price fixing.

### B. Customer Suspicions of Price Fixing

Defendants also present evidence that numerous class members had expressed suspicions that the leading producers of bulk extruded graphite had colluded to fix prices. In 1996, the accounting firm KPMG Peat Marwick LLP ("KPMG") conducted a survey of 32 SGL US bulk extruded graphite customers; seven of these customers expressed to KPMG interviewers some suspicion that the Defendants were fixing prices. Frank Schoch, now the president and co-owner of one the named plaintiffs, Graphite Machining, Inc. ("GMI"), testified in a deposition that he has long been suspicious of pricing practices in the extruded graphite industry. During the 1980s, Mr. Shoch sent several letters to the United States Department of Justice, which requested that they investigate price fixing in the graphite industry. Matthew Shane, the General Manager of GMI, also testified in a deposition that he had noticed similarities in pricing between competing extruded graphite sellers, and considered it to be suspicious behavior.

As Plaintiffs point out, the customer statements (and KPMG's paraphrases of customer statements) defendants quote from KPMG's survey are unverifiable hearsay. Such hearsay statements would not be admissible at trial, and so are inadmissible to support motions for summary judgment. Indeed, subsequent statements of the interviewees cast the reliability of the survey evidence into doubt. Declarations of two of the seven quoted interviewees indicate that they had no basis for believing that the defendants were engaged in price fixing, and that representatives of SGL Carbon LLC justified increased prices by referring to their own increased costs.

Mr. Schoch's deposition testimony is also of limited value in proving that plaintiffs had

notice of the defendants' alleged price fixing. The fact that Mr. Schoch, throughout the 1980s and 1990s, and Mr. Shane, in 1996 or 1997, suspected that sellers of graphite products were engaging in price fixing is hardly dispositive of the issue of whether plaintiffs had notice before 1998.[4] Mr. Schoch's and Mr. Shane's pre-1998 suspicions of price fixing could lead a reasonable factfinder to determine that a diligent plaintiff would have been noticed before 1998. But that factfinder could also decide that their suspicions do not prove that a reasonably diligent plaintiff would have been on notice of his claim.

### C. Government Investigations and Settlements

Defendants also demonstrate that from 1997 to 1999 public information was available about government investigations of price fixing in the graphite industry and about related settlements into which members of that industry, including certain defendants, entered. Defendants point to numerous industry and government press releases, wire service stories, and newspaper articles that discuss an ongoing Department of Justice investigation into pricing practices in the graphite industry and litigation brought by the government and private parties against corporations in that industry (including certain of the defendants). These documents date from 1997 to 1999. According to defendants, they prove that a reasonably diligent plaintiff would have been aware of a potential cause of action for price fixing in the bulk extruded

---

[4]Plaintiffs state, without direct evidentiary support, that Mr. Schoch only acquired a controlling stake in plaintiff corporation GMI in 2000. The record demonstrates that Mr. Schoch started a graphite machining company in 1978, which he sold to SGL Carbon LLC in 1997. As of 1998, Mr. Schoch owned a company named Mercury Machine and Tool, for which Mr. Shane also worked. The Court is not satisfied that defendants have established that Mr. Shoch and Mr. Shane worked for GMI before 2000. It would be unfair for this Court to impute Mr. Schoch's and Mr. Shane's pre-1997 suspicions, much less notice, of price fixing to GMI.

**NOT FOR PUBLICATION**

graphite market before 1998.

The vast majority of the public information relating to antitrust investigations and settlements in the graphite industry concerns graphite electrode pricing or refers to investigations of price fixing by producers of generic "graphite products." All of the settlements related to graphite electrode pricing.[5] Only one wire service story and two SEC filings state that UCAR had been served subpoenas for documents relating to both graphite electrodes and "bulk graphite." The relevant story and the filings each contain only one sentence that mentions subpoenas relating to bulk graphite.

### D. Conclusion

The sum of defendants' evidence is not nearly enough to compel a reasonable jury to find that a diligent plaintiff would have had notice of his claim before December 1998. Defendants have not shown that plaintiffs will be unable to meet their burden for proving fraudulent concealment at trial. A material issue of fact exists, and the Court will not grant summary judgment.


It is on this 4th day of April, 2007,

ORDERED that defendants' motion for summary judgment be DENIED.

**s/ William H. Walls**
United States Senior District Judge

---

[5]The plaintiffs in the private graphite electrode civil actions were steelmakers because graphite electrodes are used for certain types of steel production.