NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | **OPINION** |
| In re: BULK [EXTRUDED] GRAPHITE | : | |
| PRODUCTS ANTITRUST LITIGATION | : | Civ. No. 02-6030 (WHW) |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**Walls, District Judge**

Defendant Robert J. Koehler ("Koehler") moves to set aside entry of default pursuant to

Fed. R. Civ. P. 55(c) and to dismiss the complaint for lack of personal jurisdiction pursuant to

Fed. R. Civ. P. 12(b)(2). The Court grants Koehler's Rule 55(c) motion and denies his Rule

12(b)(2) motion.

**FACTS AND PROCEDURAL BACKGROUND**

This case concerns an alleged antitrust conspiracy among numerous parties, including the

defendants, to fix prices charged for bulk graphite products in the United States and elsewhere.

Most of the facts of this case have been set forth in this Court's earlier opinions granting

certification of the plaintiffs' class, denying defendants' motions to dismiss the Consolidated

Amended Class Action Complaint (the "Amended Complaint"), and denying defendants' motion

for summary judgment. In re: Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-6030,

slip op. at 1 (D.N.J. Oct. 28, 2004); In re: Bulk [Extruded] Graphite Prods. Antitrust Litig., No.

02-6030, slip op. at 1 (D.N.J. Apr. 24, 2006); In re: Bulk [Extruded] Graphite Prods. Antitrust

Litig., No. 02-6030, slip op. at 1 (D.N.J. Apr. 4, 2007). The facts recited herein pertain

specifically to the defendant Koehler and the motions at issue.

Koehler is the Chairman of the Board of Management of SGL Carbon Aktiengesellschaft

("SGL AG"), a German corporation with its principal place of business in Germany. He is a

citizen and full time resident of Germany and conducts business from his office in Germany.

Koehler's personal contacts with the United States are not particularly extensive. He has traveled

to the United States on a limited basis for business purposes, but has never been employed in or

commuted to the United States. He does not have and has never had an office, a place of

business, a residence, real estate, a leasehold interest, a registered agent for service of process,

employees, a bank account, a post office box, or a telephone listing in the United States. He has

never paid taxes in the United States nor has he commenced suit in any court in the United

States.[1]

On December 18, 2002, plaintiffs filed the initial complaint in this action alleging that

multiple defendants, including SGL AG and Koehler, had fixed extruded graphite prices in the

United States. Plaintiffs filed an amended complaint on April 29, 2003. On May 22, 2003, the

Court authorized APS International Ltd. ("APS") to serve process within 150 days upon Koehler

in Germany, in accord with the Hague convention. Plaintiffs attempted to cause service in

---

[1]However, in 1999 Koehler pleaded guilty in United States District Court to conspiring to fix the price of graphite electrodes in the United States and elsewhere. Transcript of Record at 13-15, United States v. SGL Carbon Aktiengesellschaft and Robert J. Koehler, No. 99-244 (E.D. Pa. June 16, 1999).

accord with the Hague Convention and German law by delivering the complaint and summons to the German Central Authority, which was then to serve the documents upon Koehler.

On August 4, 2005, after numerous unsuccesful attempts and delays, the German Central Authority served Koehler. This was well past the 150 day deadline specified in the Court's May 22, 2003 order. On August 24, 2005, Koehler moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(5) because service of process was insufficient and under Fed. R. Civ. P. 12(b)(2) because Court lacked personal jurisdiction over him. On April 24, 2006, the Court denied the 12(b)(5) motion to dismiss for insufficient process and granted plaintiffs leave to amend service upon Koehler. With respect to Koehler's 12(b)(2) motion, the Court found that the plaintiffs had failed to demonstrate a basis for its personal jurisdiction over Koehler. Instead of dismissing the complaint on this ground, however, the Court granted plaintiffs' request for additional jurisdictional discovery. Since that time, the plaintiffs have engaged in limited jurisdictional discovery, including the deposition of Robert P. Krass ("Krass"). Krass was the former President of UCAR Carbon Company, and the plaintiffs describe Krass as Koehler's "primary co-conspirator."[2]

On May 30, 2006, plaintiffs finally served valid process upon Koehler in Germany. On September 29, 2006, plaintiffs requested default be entered against Koehler pursuant to Fed. R.

---

[2]Plaintiffs named UCAR as a defendant in the amended complaint. UCAR Carbon Company was the U.S. subsidiary of UCAR International, Inc., which changed its name to GrafTech International, Ltd. ("GrafTech") in 2002. On March 8, 2004, this Court approved plaintiffs' settlement with GrafTech/UCAR. Plaintiffs settled their claims against GrafTech/UCAR in exchange for $450,000 and GrafTech's pledge to cooperate in the litigation's ongoing prosecution.

NOT FOR PUBLICATION

Civ. P. 55(a), alleging that Koehler had failed to answer or otherwise respond to the complaint.

After default was entered, Koehler filed the present motion to vacate default and to dismiss the

complaint because the Court lacks personal jurisdiction.

## MOTION TO VACATE ENTRY OF DEFAULT

### I. Standard

The Court may set aside an entry of default for good cause.  Fed. R. Civ. P. 55(c).

Defaults are generally disfavored and any doubts concerning whether default should be vacated

"should be resolved in favor of setting aside the default and reaching a decision on the merits."

Gross v. Stereo Component Sys., Inc., 700 F.2d 120, 122 (3d Cir.1983).  The Third Circuit

requires a "district court to consider the following factors in exercising its discretion in granting

or denying a motion to set aside a default under Rule 55(c) [. . .] : (1) whether the plaintiff will be

prejudiced; (2) whether the defendant has a meritorious defense; (3) whether the default was the

result of the defendant's culpable conduct."  United States v. $55,518.05 in U.S. Currency, 728

F.2d 192, 195 (3d Cir. 1984).  Ultimately, however, the decision to set aside an entry of default

remains primarily within the Court's discretion.  Bailey v. United Airlines, 279 F.3d 194, 204 (3d

Cir. 2002); Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984).

### II. Discussion

Because default is disfavored in our judicial system, courts will generally vacate default

unless certain conditions are met.  Here, the relevant conditions are not met.  First, there is no

indication that the plaintiffs will be prejudiced if default is vacated.  Second, it is premature for

**NOT FOR PUBLICATION**

the Court to determine now that the defendant does not have any meritorious defenses.  Third,

since the Court deferred its final decision on Koehler's Rule 12(b)(2) motion and granted

plaintiffs additional jurisdictional discovery, Koehler's decision not to file an answer until the

preliminary issue of personal jurisdiction had been resolved is not "culpable conduct."  Plaintiffs

do not oppose Koehler's motion to vacate default.  The Court grants Koehler's motion to vacate

entry of default.

## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Koehler maintains that he lacks the requisite minimum contacts with the United States to

be subject to personal jurisdiction in this Court.   Plaintiffs respond by arguing that jurisdiction

against Koehler lies on three distinct grounds.  First, they argue that this Court has personal

jurisdiction over Koehler based on the "effects test" described in Calder v. Jones, 465 U.S. 783,

790 (1984).  Second, they argue that the Court has personal jurisdiction over Koehler under a co-

conspirator theory because his co-conspirators performed substantial acts in furtherance of the

conspiracy in the United States.  Third, they argue that the Court may exercise personal

jurisdiction over Koehler under New Jersey's long-arm statute.

### I. Standard

#### A.  Burden of Proof

A plaintiff is not required to plead specific facts in its complaint to support a court's

exercise of personal jurisdiction over the defendant.  See Fed. R. Civ. P. 8.  Should the defendant

raises the issue of personal jurisdiction by bringing a Rule 12(b)(2) motion, however, it falls to

the plaintiff to establish the court's jurisdiction over the defendant by a preponderance of the evidence. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 257 (3d Cir. 1998). "[T]he plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Patterson by Patterson v. F.B.I., 893 F.2d 595, 603-04 (3d Cir. 1990); see also Stranahan Gear Co. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1986) (cursory allegation reiterated in a sworn affidavit is insufficient to satisfy the plaintiff's burden of proof). "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." Patterson by Patterson, 893 F.2d at 604.

When the court does not hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, "the plaintiff need only establish a prima facie case of personal jurisdiction." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004). To establish a prima facie case, the plaintiff must present specific facts that would allow the court to exercise jurisdiction over the defendant. See United States v. Swiss American Bank, Ltd., 274 F.3d 610, 619 (1st Cir. 2001) ("The prima facie showing must be based upon evidence of specific facts set forth in the record... [and] go beyond the pleadings and make affirmative proof") (internal quotations and citation omitted).

In considering plaintiffs' evidence before an evidentiary hearing on jurisdiction or trial, the court must accept their evidence as true and resolve all disputed facts and draw all reasonable inferences in their favor. See Miller Yacht Sales, 384 F.3d at 97; Joint Stock Soc. Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court v. Heublein, Inc., 936

F. Supp. 177, 192 (D. Del. 1996).  See also Boit v. Gar-Tec Prods., Inc.,  967 F.2d 671, 675 (1st

Cir. 1992); Sears, Roebuck & Co. v. Sears PLC, 744 F. Supp. 1297, 1301 (D. Del. 1990).

If the nonmoving party succeeds in presenting a prima facie case based on its proffered

evidence, the court may deny the motion to dismiss or it may order an evidentiary hearing.  Boit,

967 F.2d at 676.  If the court denies the motion, the moving party later may raise again the issue

of the exercise of personal jurisdiction over it.  Id. at 967 F.2d at 676.  See also 5B Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (3d ed. 2004); 5C Wright &

Miller § 1373.  Eventually, the nonmoving party must establish by a preponderance of the

evidence, either at a pre-trial hearing or at trial, that the exercise of personal jurisdiction over the

moving party is proper.  See 5A Wright & Miller § 1351; Carteret Sav. Bank, F.A. v. Shushan,

954 F.2d 141, 146-48 (3d Cir. 1992).

## B.  Personal Jurisdiction

Plaintiffs bring this action under sections 4 and 16 of the Clayton Act.  15 U.S.C. §§ 15,

26.  In cases arising under federal laws, the Court looks to the Due Process clause of the Fifth

Amendment to guide its jurisdictional inquiry.  See Max Daetwyler Corp. v. Meyer, 762 F.2d

290, 293 (3d Cir.1985) (case arising under federal patent law), cert. denied, 474 U.S. 980 (1985).

The Fifth Amendment inquiry incorporates the Fourteenth Amendment standards of due process

established in the International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), line of cases.

Max Daetwyler, 762 F.2d at 293.  Under International Shoe, a court may exercise personal

jurisdiction over a nonresident defendant when that defendant has "certain minimum contacts

with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair

play and substantial justice.'"  326 U.S. at 316. (citations omitted).

In order for a court to execise "general jurisdiction" over a nonresident defendant, that defendant must have "continuous and systematic" contacts with the forum.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984).  Plaintiffs do not argue that Koehler had "continuous and systematic" contacts with the forum, and the Court will not entertain whether it may exercise personal jurisdiction over Koehler under the Helicopteros "general jurisdiction" standard.

The relevant inquiry here is whether the Court may exercise "specific jurisdiction" over Koehler.  When the cause of action relates directly to a defendant's contacts with the forum state, the Court may exercise "specific jurisdiction" over that defendant.  In such cases a court may exercise jurisdiction over a nonresident defendant if he purposely created contacts with the forum state making it reasonable for him to "anticipate being haled into court there."  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  These contacts must be based on "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253 (1958).

What constitutes minimum contacts varies with the "quality and nature of defendant's activity."  Hanson, 357 U.S. at 253.  In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum and the litigation."  Keeton v. Hustler Magazine, 465 U.S. 770, 775 (1984).  There must be at least "a single deliberate contact" with the forum state that relates to the cause of action.  United

States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988).

The unilateral acts of the plaintiff, however, will not amount to minimum contacts. Hanson, 357

U.S. at 253. When the suit proceeds under a federal law which authorizes nationwide or

worldwide service of process, a district court may aggregate a defendant's "national contacts"

with the United States as a whole to determine whether a foreign defendant has sufficient

contacts with the forum. See Max Daetwyler, 762 F.2d at 293.

        In the case of intentional torts which have effects in the forum, the minimum contacts

requirement may be satisfied under the "effects test" articulated in Calder, 465 U.S. at 790. See

IMO Indus., Inc., 155 F.3d at 260 (citing Keeton, 465 U.S. at 780) ("Generally speaking, under

Calder an intentional tort directed at the plaintiff and having sufficient impact upon it in the

forum may suffice to enhance otherwise insufficient contacts with the forum such that the

'minimum contacts' prong of the Due Process test is satisfied."). In IMO, the Third Circuit

applied the Calder test in the context of a business tort, and devised a three-part test to determine

whether minimum contact with the forum exists under a narrowed version of the Calder effects

test. It held that the minimum contacts requirement of International Shoe is satisfied if: 1) the

defendant committed an intentional tort; 2) the plaintiff felt the brunt of the harm in the forum;

and 3) the defendant aimed his tortious conduct at the forum. IMO, 155 F.3d at 265. To fulfill

the third IMO prong, plaintiffs must show that "the defendant knew that the plaintiff would

suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific

activity indicating that the defendant expressly aimed its tortious conduct at the forum." Id. at

266.

**NOT FOR PUBLICATION**

Courts, including this Court in its April 24, 2006 opinion, have applied the Calder effects

test in antitrust cases. See Fleury v. Cartier Intern'l, No. C-05-4525, 2006 WL 2934089, *2

(N.D. Cal. Oct. 13, 2006); American Copper & Brass, Inc. v. Mueller Europe, Ltd., 452 F. Supp.

2d 821, 828 (W.D. Tenn. 2006); In re: Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-

6030, slip op. at 1 (D.N.J. April 24, 2006).

Assuming minimum contacts have been established, a court "may" inquire whether "the

assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger

King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (quoting Int'l. Shoe Co., 326 U.S. at 320).

For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable

to require the defendant to defend the suit in the forum state. See World-Wide Volkswagen, 444

U.S. at 292 (enumerating factors determinative of whether it is reasonable to require defendant to

defend suit in forum state). Though this inquiry is nominally discretionary, the Third Circuit has

characterized it as a "mandatory" inquiry. Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149

F.3d 197, 206 (3d Cir. 1998)

## II. Discussion

In its initial consideration of Koehler's Rule 12(b)(2) motion, the Court determined that

plaintiffs had not proved that Koehler was subject to the jurisdiction of the forum under any of

the theories plaintiffs initially proposed. In particular, the Court found that the plaintiffs had not

presented sufficient evidence to show that Koehler expressly aimed his tortious activity at the

United States. The Court concluded that the plaintiffs' evidence showed that Koehler had been

involved in a conspiracy to fix bulk graphite prices in Europe and a conspiracy to fix graphite

electrode prices in the United States, but not that Koehler was involved in a conspiracy to fix

bulk graphite prices in the United States.  Rather than dismiss the claim for lack of personal

jurisdiction, the Court determined that the best course was to grant plaintiffs' request for futher

jurisdictional discovery.

### A.  Calder Effects Test

Plaintiffs again argue that Koehler is subject to personal jurisdiction based on the Calder

effects test.  Since the Court's original decision was based on the plaintiffs' inability to marshal

facts to fill the third prong, the Court will discuss the third IMO prong first.

### 1.  Did Koehler Expressly Aim His Tortious Conduct at the Forum?

To show that the Koehler "expressly aimed his tortious conduct at the forum such that the

forum can be said to be the focal point of the tortious activity," the plaintiffs "must show that

[Koehler] knew that the plaintiff would suffer the brunt of the harm caused by the tortious

conduct in the forum" and "point to specific activity indicating that [Koehler] expressly aimed

[his] tortious conduct at the forum."  IMO, 155 F.3d at 266.  The applicable forum here is the

United States as a whole, because the plaintiffs have brought suit under Section 12 of the Clayton

Act, 15 U.S.C. § 22.  See In re Auto. Refinishing Paint Antitrust Litig, 358 F.3d 288, 298 (3d

Cir. 2004) ("federal court's personal jurisdiction may be assessed on the basis of the defendant's

national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide

service of process").  The plaintiffs have produced numerous pieces of evidence to support their

contention that the United States was the focal point of Koehler's tortious activity.

First, plaintiffs produce evidence that Krass and Koehler were involved in fixing the price

of graphite electrodes.[3]  When deposed on July 27, 2006, Krass testified that he and Koehler

attended meetings in Europe during which agreements to fix graphite electrode prices were

reached:

> Q.  And is it correct that in approximately May of 1992 there was a meeting in Longon, England, among various manufacturers of graphite electrodes to reach agreements?
> A.  That's correct.
> Q.  And you attended that meeting, yes?
> A.  Yes, I did.
> Q.  And Mr. Koehler also attended?
> A.  Yes, he did.
> [. . .]
> Q.  And to – and what was generally agreed upon at the London meeting in May of 1992?
> A.  Well, there were – what the prosecutors of me said were tenets of agreement, and they had a list of them.  I don't have that list in front of me, but essentially it was certain quotas to certain countries by certain suppliers, uhm, specificity with regard to prices for each and every marker, uhm, uhm, elimination of what the Japanese had as a method for price reduction . . . – and it went on.  There were a number of items.  I don't recall the rest of them.

(Krass Dep., July 27, 2006, 20:11-22:08.)  Krass also testified that he pleaded guilty to a United

States Department of Justice ("DOJ") indictment for fixing graphite electrode prices.  Id. 22:09-

16.  An noted above, Koehler pleaded guilty to a DOJ indictment in 1999 for participating an

antitrust conspiracy relating to fixing the prices of graphite electrodes in the United States.

Second, plaintiffs produce evidence that shows that manufacturers, including UCAR and

SGL AG, conspired to fix prices for extruded graphite in Europe.  They cite a decision of the

Commission of the European Communities (the "EC Decision"), dated December 17, 2002,

---

[3]To clarify, the present litigation concerns a different UCAR and SGL product – extruded graphite – which has different uses and a different set of customers.

which concerned collusion in fixing the prices of extruded graphite sold in Europe.  The relevant

paragraphs of the decision read:

> The topic of the meeting was the rise of prices, particularly in Germany, England,
> France, and Italy and the withdrawal of discounts.  In addition, each participant
> reported on the level of prices in the different European markets.

(EC Decision ¶ 296).

> From the description of the facts, it can be concluded that both UCAR and SGL
> implemented the conspiracy to increase extruded graphite prices on the
> Community/EEA market.

(EC Decision ¶ 313).

Third, plaintiffs produce evidence that, viewed in their favor, tends to support the

conclusion that Koehler and Krass individually participated in the conspiracy to fix extruded

graphite prices in Europe.  In his deposition Robert Krass testified about a meeting with Koehler

in Frankfurt, with no other manufacturers present:

> Q.       . . . Now in addition to the graphite electrodes price fixing conspiracy, did you
>          ever have any conversations with Mr. Koehler about specialty products?
> A        Uhm, initially, uhm, no, but as time went on and the performance of the graphite
>          electrode business continued to improve, uhm, the conversation expanded beyond
>          just graphite electrodes.
>          [. . .]
> Q.       Okay.  And what did Mr. Koehler say to you about specialty graphite,[4] if you
>          recall?
> A.       I don't recall any specific phrases or words, but the – the expansion of
>          cooperation from graphite electrodes to other products was the theme, and the idea
>          was why can't we get the same level of profitability from the other products that
>          we get from the graphite electrodes.
>          [. . .]
> Q.       What did you understand Mr. Koehler to be saying to you when he spoke to you

---

[4]"Specialty graphite" is a category that comprises numerous other graphite product sub-
categories, including extruded graphite.

> about other products?
>
> A.      Well, he had a greater interest in the other products than did I, and the indication was that why – if we are able to make this work with graphite electrodes, why can't we make it work with other products such as . . . this extruded product that you're referring to . . . .

(Krass Dep., 28:23-31:15.)  In addition, Krass testified that Koehler had made telephone calls to

him during which they discussed the pricing of graphite products, including specialty graphite

products:

> Q.      In addition to meetings with Mr. Koehler, you made mention of telephone calls. Did you, during the period, let's say, '93 to '97, call Mr. Koehler?
>
> A.      Yes.
>
> Q.      And during that same period did he call you?
>
> A.      Yes.
>
> Q.      And, on occasion, did those phone calls touch upon the specialty business?
>
> A.      Yes.
>
> Q.      And when those phone calls touched upon the specialty business, is it you memory that there was some problem in pricing with some customer?
>
> A.      It would have been about many, uhm, different subjects, but, certainly, pricing.  If there was a problem with a particular product and a particular application, uhm, with regard to pricing, the subject would come up, yeah.

(Krass Dep., 36:18-37:17.)

Fourth, plaintiffs present evidence that implies Krass suggested to Koehler that he should

establish contacts between SGL and UCAR to facilitate extracting a higher level of profitability

from the extruded graphite market in the United States.  Krass testified:

> A.      . . . Uhm, I suggested that [Koehler] have one of his people talk to one of my people.
>
> Q.      And who was that person at UCAR?
>
> A.      Bob Hart was the person who had formal intimate knowledge of that product group [specialty products] than I and I suggested that he become the – he corresponded with whomever SGL cared to appoint.
> [. . .]
>
> Q.      Okay.  After your conversation with Mr. Koehler about expanding what was being done in graphite electrodes, you did tell Mr. Hart, is it correct, to talk to the

> appropriate SGL person to follow up?
> A.  I told him there was – I told Hart there was interest raised by Koehler in these other products and I didn't know enough about them and he should respond in any way requested by SGL.
> [. . .]
> The need arose for me to be aware when I would get a phone call or otherwise conversation from, uhm, Mr. Koehler who would either have a comment or a question regarding some kind of arrangement [. . .], and I would go to Hart and say what – what occurred with X, Y or Z, the situation that Koehler might have raised.
> My issue with Hart was don't have deviations, don't have complaints, and if there were deviations, I would get complaints.

(Krass Dep., 32:04-36:16.)  At another point, Krass further expanded on what he understood

Hart's role to be with respect to pricing in the United States:

> Q.  To you knowledge, is it correct that SGL and UCAR engaged in a price fixing conspiracy for specialty products in the United States?
> [. . .]
> A.  Yeah, I – I can only comment on the policy that I set.  The policy that I set was Hart cooperate with these other people.  Specifically whether they cooperated, whether they were successful, I know the product prices went up because monthly I would get what we called an operating and revenue statement, and it was categorized by product line, and each product line was improving in profitability, so I was happy, but, specifically, I can't answer your question.

(Krass Dep., 46:06-47:03.)  From this passage, it is possible to infer that the increased

profitability of the various product lines was a result of the cooperation policy that Krass

implemented with Koehler's assistance.

Fifth, Krass testified that in order for any European bulk graphite price-fixing conspiracy

to be successful (like the graphite electrode price-fixing conspiracy), it would have to be directed

toward the worldwide market in that product, including the United States bulk graphite market:

> Q.  When you had the conversation with Mr. Koehler about expanding your arrangement beyond graphite electrodes, did you understand Mr. Koehler to be saying to you that this would be done on a worldwide basis?

-15-

> A.  Well, I don't recall any specific statement as to global, uhm, parameters. The issue of graphite electrodes is if you sold them one place for one price and another place for another price, somebody would go to the other place that was a cheaper price, uhm, so we employed a phrase that was common currency price parity, so no matter what currency you sold it in, no matter what part of the world you sold it in, it had to equivocate to a common price. That formula was necessary to get the – the level playing field.
> If we didn't do that in the other products, you again, would have a disruptive market. So global in that sense is applicable to wherever the customer was. Whatever currency, whatever nationality, whatever his needs were, they had to be common.

(Krass Dep., 33:20-34:22.) Later on, Krass states that the he understood the cooperation policy

he and Koehler had allegedly discussed, which was to be implemented by Hart at UCAR and

Hart's counterpart at SGL, had to be a policy of global cooperation.

> Q.  . . . And is it you understanding that the policy you implemented for the sale of specialty products in the U.S. also was implemented in Europe?
> A.  As I answered you earlier, if you – if you don't have a global perspective of any of these kinds of product which travel well, there's no shelf life to them, they could be a year on boat, you got to have a common price or your – it won't work, a common price for the world.

(Krass Dep, 47:10-22.)

Viewed cumulatively and in favor of the party asserting jurisdiction, the evidence

suggests that Koehler expressly aimed tortious conduct at the forum. Krass's deposition

testimony supports the conclusion that Koehler acted, in his communication with Krass, to fix

the prices of bulk graphite worldwide, not just in Europe. Read liberally, it suggests that Koehler

was involved in a conspiracy to fix prices in the United States as well. Though Krass did not

expressly state Koehler acted to fix prices in the United States, he clearly did state that a

conspiracy to fix prices in Europe must necessarily involve the fixing of prices in other markets,

including the United States.

In sum, plaintiffs have marshalled evidence that Koehler did expressly direct acts in furtherance of price fixing in the United States. The Court's conclusion is buttressed by two considerations. First, the nature of price fixing in a conspiracy to fix prices in a global commodity like bulk graphite makes it difficult to identify a precise focus for tortious acts. Because the IMO test was designed for business torts, it is difficult to apply strictly the IMO test in the international antitrust context. The special character of an antitrust claim leads the Court to interpret more liberally the phrase "expressly aim[. . .] tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." IMO, 155 F.3d at 266. To be sure, plaintiffs' evidence is thin, but at this stage of the proceedings it is sufficient to defeat a Rule 12(b)(2) motion.

Second, the jurisdictional inquiry here strongly implicates the merits of the case, and ultimately any final determination as to the question of personal jurisdiction is best deferred until after the parties have presented the full array of evidence.[5] See 5B Wright & Miller § 1351.

## 2. Did Koehler Commit an Intentional Tort?

In its April 4, 2006 opinion the Court did not expressly address whether Koehler had committed an intentional tort, namely fixing bulk graphite prices. The Court finds that the plaintiffs' evidence described above is sufficient to meet plaintiffs' prima facie burden to produce evidence showing that Koehler did commit an intentional tort.

---

[5]Any deeper inquiry into the Court's jurisdiction over Koehler would inevitably turn into a miniature trial on whether there was a conspiracy to fix extruded graphite prices in the U.S. and what role Koehler played in such a conspiracy. For this reason, the Court is not inclined to order a special hearing to address the issue of personal jurisdiction and instead defers the final determination of the issue of personal jurisdiction until the trial on the merits.

### 3. Did Plaintiffs Suffer the Brunt of Their Harm in the Forum?

The Court must also determine whether plaintiffs have presented evidence that they felt

the brunt of the harm from the intentional tort in the forum. <u>IMO</u>, 155 F.3d at 265. In its earlier

consideration of its jurisdiction over Koehler, the Court withheld judgment as to whether

plaintiffs produced evidence in support of this prong.

In its April 6, 2006 order granting plaintiffs' motion for class certification, the Court

defined the plaintiff class as:

> All persons (excluding federal government entities, defendants, and their respective
> parents, subsidiaries, and affiliates) who purchased Bulk Extruded Graphite Products in
> the United States, directly from the defendants, their affiliates or subsidiaries, during the
> period January 1, 1993 through December 31, 1998.

<u>In re: Bulk [Extruded] Graphite Products Antitrust Litigation</u>, No. 02-6030 (D.N.J. October 28,

2004) (order). Because they purchased the defendants' products in the United States, the Court

finds that plaintiffs have met their burden and shown that the members of the plaintiff class

suffered the brunt of their harm here.

### B. Plaintiffs' Other Arguments in Favor of Personal Jurisdiction

Since the Court has determined that plaintiffs have made a sufficient showing such that

minmum contacts exist between Koehler and the forum under the <u>Calder</u> effects test, it will not

consider plaintiffs' arguments that minimum contacts exist under a co-conspirator theory or

under New Jersey's long arm statute.

### C. Fair Play and Substantial Justice

Koehler does not argue that exercising jurisdiction would offend notions of "fair play and

substantial justice." He make no specific claims concerning the burdens placed on him, the

**NOT FOR PUBLICATION**

forum State's interest, or any of the other factors relevant to fairness.  See Mellon Bank (East)

PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1222 (3d Cir. 1992).  Koehler simply reiterates that it

would be unfair to subject him to personal jurisdiction in an alien forum with which he has no

contacts.  Since the Court has already addressed the issue of minimum contacts, this argument is

inadequate.  See Pennzoil Prods., 149 F.3d at 208.  The Court finds that exercising jurisdiction

over Koehler accords with fundamental notions of "fair play and substantial justice."


## CONCLUSION

For the reasons described above, the Court grants defendant's motion to set aside entry of

default and denies defendant's motion to dismiss.


July 30, 2007

s/William H. Walls
United States Senior District Judge
